All right. Our final case for this morning is Persinger v. Southwest Credit Systems. So we'll begin whenever you're ready, Mr. Marko. Good morning, Your Honors, and may it please the Court, David Marko for the appellant for Persinger. The District Court erroneously entered summary judgment in favor of the Appellee, Southwest Credit Systems, and in so doing it overlooked evidence, it misinterpreted evidence, it discounted admissible evidence, and accepted inadmissible hearsay evidence. Given these fundamental errors in entering summary judgment for Southwest Credit, District Court's order should be reversed, and this matter should be remanded for further proceedings. Southwest has raised a standing challenge, so I'm going to start there. Candidly, Your Honors, it's simply not an issue in this case. Ms. Persinger's claim is predicated on Southwest Credit's violation of the privacy provisions of the Fair Credit Reporting Act. Mr. Marko, I'd like to back up even a little bit before that. Of course, Your Honor. The debt here, what evidence is there that that flows from a credit transaction? Well, there was actually no dispute with regards to it being part of a credit transaction. The two debts at issue, there was an AT&T debt and there was a Viasat debt. They were both owed for personal household purposes. Also, because the case emanates under the FCRA, we don't believe that that is implicated in this particular issue, Your Honor. You may continue. Thank you, Your Honor. As noted, Ms. Persinger's claim is predicated on Southwest Credit's violation of the privacy provisions of the Fair Credit Reporting Act. So to have Article III standing, the plaintiffs must demonstrate, among other things, that they suffered a concrete harm. Central to assessing concreteness is whether the asserted harm has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts. The invasion of privacy, including the disclosure of private information, is such a harm. One that has been acknowledged by both the Supreme Court, and indeed this court, in TransUnion v. Ramirez, the Supreme Court cited to this court's opinion, in Gadelhack v. AT&T, which in addition to this court's holdings in Groshek v. Tom Warner and Gubler v. Tom Warner, noted that it is well established that violations of rights of privacy are indeed actionable. So let me ask you something. Of course. Do you see this as an instance where there was a disclosure of her, this soft pull of her credit report, to one entity, Southwest Credit? Or you at one point mentioned, I think it was in your reply brief, that there's an admission that a handful of people, you know, individual people, it was a disclosure, in fact, to like 10 or 15 people, not just one entity. Does that matter? No, it doesn't, Your Honor. I mean, first and foremost, I think it's a spurious distinction to draw the distinction between what is a hard inquiry, a soft inquiry, a propensity to pay score. The fact of the matter is, they need a permissible purpose to be able to procure a consumer report. And there's no dispute here that the propensity to pay score is such a consumer dispute. And what is a propensity to pay score? It's a summary of the information that is contained within an individual's consumer report. A summary of all the information that demonstrates whether that individual has, in fact... And that, you're saying, is private information, which was disclosed. There was an intrusion upon seclusion. Without question, Your Honor. But we actually go one further. Though they argue that this is a propensity to pay score, they neglect to acknowledge the fact that there's a judicial admission that actually what was disclosed was private and personal financial information disclosed to Southwest Credit. And then I think the issue that you're talking about earlier, Your Honor, is that it was viewed by various agents and employees of Southwest Credit. And that's the issue here. It's not just the fact that there was this personal private information disclosed to them. It was actually viewed by others. But in and of itself, the fact that they procured the information, they obtained the consumer report without a permissible purpose, that is an invasion of privacy, and that is the harm itself that justifies Article 3 standing. And that's the common law analog that's been required by the Supreme Court. The tort of invasion of privacy has been recognized for over 100 years. A Harvard Law Review article from 1890 entitled The Right to Privacy opened by noting that the individual shall have full protection in person and in property is a principle as old as the common law. Southwest Credit conflates the issue of standing with damages by attempting to minimize the impact the invasion of privacy had on her. But again, the invasion of privacy is the harm itself. We know this to be true because the Supreme Court in TransUnion v. Ramirez held that the class members whose inaccurate reports had been disseminated to third parties had suffered a concrete injury in fact under Article 3. The court did not discuss the nature of the harm that they discovered, that they had suffered. And it's the same here. The invasion of privacy that resulted from their impermissible procurement of a consumer report is sufficient. Procurement and I take it disclosure, but you have that here. It goes one step further, yes. But I would argue that the mere procurement of the consumer report. Again, what is the consumer report? Personal, private, confidential information. The mere procurement without permissibility is an invasion of privacy. That invasion of privacy is sufficient in and of itself to confer Article 3 standing. Moving on to the summary judgment. The summary judgment was, this case was a fact-intensive case that never should have been decided at summary judgment. The court's role is not to weigh evidence, but that's exactly what it did here. It would appear that the court first denied Ms. Persinger's motion for summary judgment and then simply granted Southwest Credit's motion for summary judgment without applying the same summary judgment standards to Southwest Credit as it had to Ms. Persinger. Instead of considering all of the evidence in favor of Ms. Persinger as the non-moving party and drawing all reasonable inferences from that evidence, it did the opposite. Can I say one thing that troubles me, even if we get past standing, and you may be right about that, but it's, there are two different debts here and it seems to me that the record list has a system, perhaps not infallible, but they do these bankruptcy scrubs and it seems like your argument would require them to have a system that was like literally doing a new scrub every day for new people and new names. They could scrub all they wanted and they weren't going to find the name that she was using. I guess the first debt was her husband's and the second debt was hers, although under another name. They finally find it, May 22nd, and they immediately stop what they're doing, but how would they have known? Well, very clearly, Your Honor. So the bankruptcy noticed that they received, that they ignored by their own admission. But the debt that you're arguing about wasn't on the table then. Well, two issues. First and foremost, again, they've admitted that the debt was on the table because they admitted that she owed the AT&T debt. So that's beyond- See, that was the husband's debt though, the AT&T, not the Viasat debt. They have judicially admitted in their answer that the debt that they were trying to collect was an AT&T debt from her. That's number one. Number two, the bankruptcy notice lists all of her names. So I think what Your Honor's getting to is the fact that the Viasat account is into the name of Brooke Casey. Right. But actually, if you look at the bankruptcy notice itself, which is at ECF 70-4, it actually lists the various permeations of her name. So they had the information, Brooke Casey, had filed for bankruptcy. That's the issue. It's not just a matter of was this particular debt discharged, but were all pre-petition debts discharged? And this was a pre-petition debt. We know that to be true because of the date of delinquency on the debt. It was incurred prior to the time that the bankruptcy was filed. In a no-asset bankruptcy, the debt was discharged. They were put on notice of it. And what did they do with that notice? They ignore it. And they ignore it at their peril. And then they rely on a procedure that the district court held was reasonable, but apparently failed 996 times in a period of two years. And that was the statute of limitations period. We don't know how many more times it failed. So the issue is, should they- Out of the 2.5 million accounts they had? Out of the two, well, irrespective of the number of accounts that they had, they had received notice. I understand I'm running out of time, and I need to save some time for rebuttal. But out of the number of accounts that they had, they received notices on 996 occasions that a debtor had received a discharge. And yet they didn't act on that. And they did so at their peril. I mean, effectively, the court held that they had a reasonable procedure with regards to a bankruptcy scrub. No one's saying that they're obligated to have a bankruptcy scrub protocol. But they did it. And they did it to avoid violating the FDCPA and the FCRA. I'm saying that if they're getting this bankruptcy notice, they should do likewise. You can save your last 30 seconds if you want to. I'll save my last 30 seconds. Thank you, Your Honor. Certainly. Mr. Watts. Thank you, Your Honor. May it please the Court. My name is Patrick Watts. I represent Defendant Appellee Southwest Credit Systems. The issues before the Court are, first and foremost, whether or not a plaintiff has standing to bring the case in this federal court. I raise that issue first because this Court has said that is the first and foremost issue to be decided by the Court. I also, if the Court does decide that it has standing, as an alternative, I ask the Court to uphold the district court's decision to affirm summary judgment in defendant's favor. So, could you address on the standing point why you don't think that the tort of intrusion on seclusion isn't a common law analog? TransUnion doesn't say there's never standing in these cases. It says you've got to find what the common law analog is. And then Congress is allowed to work from there and bring something up to the point of a claim that can be brought in federal court. Your Honor, I would answer that twofold. And when you refer to TransUnion, you're referring to Ramirez v. TransUnion. Right, right, right. Your Honor, twofold. The court in Ramirez looked at the particular elements of defamation being the hook there, the common law hook, and actually applied one of the elements being publication to a certain group who had standing and said where it wasn't published, there is no standing. And why I think that analysis is important is because that instructs this Court that they shouldn't just look and say, well, it's a, in that case, it's an untrue statement about terrorism in that case. So it should be considered, you know, it's close enough to defamation. Instead, the court looks at the particular elements of the common law analog. An invasion upon seclusion, even as cited in the restatement of torts, which is cited throughout the brief, requires something much, much more than the situation present in this case. In what sense? It requires not just that a reasonable person would be offended by the invasion of privacy, but a reasonable person would be highly offended by the invasion of privacy. So if you had taken her information, exactly the same information that you took, and you decided to publish it on the first page of the Chicago Tribune, would that be enough? Your Honor, I don't... In other words, destroying her privacy to that extent. Would that be enough to confirm... My argument would be potentially, yes, Your Honor. That would... I'm not arguing... In other words, potentially, you know, there's some degree of disclosure. People think their personal financial information is private. And so it was on the front page of the Tribune. And I presume the answer would be the same if you posted it on, you know, a Facebook account, or, you know, you put something up on some other social media site. So then the next question is, well, you know, this was this company that gets this. And a bunch of people at the company all, you know, are kind of casually probing around her personal information. Why isn't that the same? I don't think... Well, first of all, Your Honor, I don't think that's an accurate description of the record that people are casually probing around her information. I believe the admission referred to relates to the viewing of... Right. But see, that... There may be a defense, you know, to this sort of thing, because there are privileges if you are doing something in the course of your business that might be applicable. But it doesn't mean you have no standing. It doesn't mean you don't have a cause of action. It just means there might be something that would legitimate what's happening. So the private information that's argued as private information isn't private in the sense of an invasion of privacy tort. It's not that type of privacy. Why not? Because this is a... We are acting as an agent of a creditor to receive a very limited piece of information. A creditor who, at all times prior to the filing of the bankruptcy in 2017, had the right to access her entire credit report. So the discussion is going to be with regard to the nature of the invasion of privacy. And we're under a summary judgment standard. Wasn't the problem here during her deposition, she was asked that follow-up question, is there any other problems that are here? And she said, yes, my privacy was invaded. So it strikes me that once we get into that summary judgment methodology, that's where you might have a problem. Your Honor, I agree that summary judgment on that issue would raise issues. The problem is the standard for this court to address standing. The burden is actually on the plaintiff, unlike the summary judgment standard. This court has said to produce evidence by a preponderance of the evidence that the injury is concrete and harmful and has occurred. But it's the alleged injury. The amount of proof ratchets up as the case moves on, from 12b-6 to summary judgment to trial. So I think you're over-reading it if you think there has to be a separate side trial. Because at that point, you would be committing the problem of actually requiring proof of actual injury, which is not what the standing requirement is. It's just that you need to allege injury in fact, with sufficient detail, plausibly and all the rest of it, and then bring in evidence that a reasonable prior fact could credit. And here we have a pleading and we have the statement during the deposition. Yeah, whatever standard the court decides to apply, I think the record here with the nature of who my client is, is a third party agency directly connected as an agency to the original creditor, who for years had a right to view all of her information. I believe that is not the type of... I'm not sure the original creditor has a continuing right to pull the full credit report. They have a right to do account review under the FCRA. They can review their own account. But what you're getting is an aggregate report, not just about one account, but about her credit worthiness. Well, they have a right to pull the full report for purposes of collection. Perpensity to pay score is a distillation. You're not saying they have the right. Somebody would have no credit left because pulling a full report is a negative event. I am not saying that, Your Honor. What we're dealing with in this case is, and I think we've agreed, is a soft pull situation where it doesn't create that negative event. And here, the propensity to pay score isn't a truly private piece of information in the sense of a common law tort. And that is because there's an ongoing and pre-existing contractual relationship between my client, the original creditor, and plaintiff in a chain where there already was pre-existing rights. This isn't somebody... A pre-existing right doesn't give you license to commit torts against somebody. You wouldn't be able to say, oh, and by the way, she's a child molester. You know, you have to operate within some boundaries. And if we're just talking about whether you operated within the boundaries, I don't know whether you don't say, yes, this is an analog to something the common law recognizes for Ramirez's purposes. And actually, since you only have a minute and 42 seconds left, I would like you to talk about the merits, because that's a separate part of this case. Yes, Your Honor. And I was trying to answer your questions. So the district court did not err in granting a summary judgment. Because, one, the district court correctly found that there was absolutely no evidence that Southwest Credit had knowledge. The account notes, which were testified to by Southwest Credit's chief information officer, unequivocally demonstrate that at the time the soft poll was conducted on January 4th, 2018, there was absolutely no knowledge by Southwest Credit that plaintiff had filed a bankruptcy. On any account, let alone that account. There is case law in this circuit that deals with the reasonableness of Southwest's procedures, and Your Honor hit on it directly in a question to the appellant's counsel. This court has found that we're, in Ross v. RJM, that simply conducting a search is enough. Even if it fails at times. Some level of attempt to conduct a search. Here we're using LexisNexis, who actually does exactly what Your Honor was describing as implicitly a very strong policy. It does do an ongoing search for the bankruptcy records. As soon as we provide that information on January 4th, LexisNexis, and this is undisputed in the record, is with us. From the moment that account is opened and the information is provided, to the end of the account, continuously reviewing for bankruptcy information. That's exactly what happened in this case, but there was an error. At LexisNexis, it's in the record, it was testified to, and that's what caused this January 4th to May 22nd delay. And this case is about a plaintiff trying to blame my client for something that LexisNexis did at the very heart of the case. We were not negligent. We followed the standards set forth in Ross v. RJM in other cases of the Seventh Circuit. Applying the reasonableness of bankruptcy scrub procedures in the FDCPA context, which is almost directly analogous to the issue in the FCRA. When is it reasonable to pull? So, Your Honor, I'm way over time. I think you're over your time. We have your point, so thank you very much. I'll give you a full minute, Mr. Marco, so that you can respond. Your Honor, I'm going to start with the last issue with regards to evidence from LexisNexis. There's no evidence from LexisNexis. They could have brought in someone from LexisNexis to testify about any errors that they had. They didn't. They had their 30B6, who has no foundation, talk about an error. That's hearsay lacking in foundation. They talk about lack of knowledge. They didn't lack knowledge because of some innocuous issue. They lack knowledge because they ignored a bankruptcy notice and they didn't wait for the results of their own bankruptcy scrub. Just having a procedure but not following it is of no consequence whatsoever. With regards to the reasonableness of their procedures, the judge usurped the jury here and found the procedures that were not followed were reasonable. He discounted the testimony of the chief compliance officer while accepting the testimony of 30B6 even though the 30B6 witness effectively designated the chief compliance officer that testifies to policies and procedures. But she hadn't been there at the earlier time period. That's not true, Your Honor. I know she'd had a period but then she was gone for a while. She wasn't in place when these things happened. During the exact time period, I will concede. However, what the court determined was that she lacked personal knowledge because and based on an affidavit that was submitted by Southwest Credit that implied that she'd not work there until 2018. That's patently false, Your Honor. Therefore, the court was acting on a false predicate. The fact of the matter was that she had been there before, she had been there afterwards, and she was designated by Southwest Credit to attest to the policies and procedures, which she did. I think you need to wrap up now. Thank you very much. Thank you very much, Your Honor. The case will be taken under advisement and the court will be in recess.